UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
:
BAK, *et al.*, :
                 Plaintiffs, :
:
    – against – :    12-CV-3220 (TPG)
:
METRO-NORTH RAILROAD COMPANY, :    **<u>OPINION & ORDER</u>**
*et al.*, :
:
                 Defendants. :
:
------------------------------------------------x

    Plaintiff Chan Young Bak brings this wrongful death and negligence action on behalf of his mother Hyang Ja Bak Lee's ("decedent") estate. The decedent fell 20 feet from a platform at the Bridgeport Train Station and died two hours later. There are six defendants in the case. Three of the defendants are public entities: the Metropolitan Transportation Authority ("MTA"); Metro-North Railroad Company ("Metro-North"); and the National Railroad Passenger Corporation ("Amtrak"). The other three defendants are private companies: Fusco Management Company, LLC ("Fusco"); ABM Industries Inc. ("ABM"); and TAMS Consultants, Inc. ("TAMS Consultants").

    Defendants have moved for summary judgment, arguing that: (1) the court lacks jurisdiction to try this case because there is no diversity of citizenship and no federal question presented; and (2) they owed no duty of care to decedent. For the following reasons, the court denies the motions for summary judgment filed by Metro-North, Fusco, and ABM. The court

grants the motions for summary judgment filed by the MTA, Amtrak, and TAMS Consultants.

Facts

The Bridgeport Train Station is owned by the Connecticut Department of Transportation ("CDOT"), which is not a defendant in this action. Wilhelmy Dep. at 132:16–18. On April 26, 2011, decedent was standing on the southbound platform of the Bridgeport Train Station. *See* Incident Report, M.T.A. Police Dep't, at 2. At 9:14 a.m., video footage shows decedent walking backward toward the southern end of the platform. *See* Defs'. Ex. L. A guardrail was present at the southern edge of the platform, but it did not cover the entire width of the platform. Torres Dep. at 74:7. This gap was present in the original designs of the train station dating back to December of 1971. *See* Letter from Randall E. Morris to Ioana Wenchell (Aug. 12, 2014) (hereafter "Morris Letter") at 1.

Still walking backward, decedent reached the end of the platform, passed through the gap in the guardrail, and fell approximately 20–25 feet to the pavement below. Torres Dep. at 74:7. Decedent suffered injuries to her head, face, and legs. Incident Report at 2. A security guard discovered decedent on the sidewalk "bleeding from her face" and called the police. *See* Fusco Mgt. Co. Incident Report at 1. Decedent was transported to St. Vincent's Medical Center, and admitted at 9:44 a.m. *See* Hospital Report of Death at 2. She died at 11:22 a.m. *Id.*

**A. The Public Entity Defendants.**

The MTA is a New York public authority whose purpose is "the continuance, further development and improvement of commuter transportation." N.Y. Pub. Auth. Law § 1264. It has a broad array of powers, including the ability to borrow and invest money, enter into contracts and leases, and own real property. *Id.* § 1265. The MTA maintains offices at the Bridgeport Train Station for MTA police. Wilhelmy Dep. at 18.

Metro-North is a wholly owned subsidiary of the MTA. *See* Cert. Incorporation Metro-North Commuter Railroad Co.; *see also Celli v. Metro-N. Commuter R.R.*, 891 F. Supp. 124, 126 (S.D.N.Y. 1995) *aff'd*, 101 F.3d 108 (2d Cir. 1996). Metro-North's duties include the operation and improvement of railroad facilities. Cert. Incorp. ¶ 4. Metro-North operates train service between Connecticut and New York City along a line known as the "New Haven Line." Wilhelmy Dep. at 23. This line is separated into upper and lower parts. *Id.* at 23–25. One of the stops on the upper part of the New Haven Line is the Bridgeport Train Station. *Id.* at 25:6–9. The Bridgeport Train Station is not "operated" by Metro-North. *Id.* at 26:-3–4. Metro-North does, however, maintain ticketing operations there. *Id.* at 117. Metro-North also posts signs at the train station, and uses the stations' public address system to make announcements and warnings to passengers. *Id.* at 119–12. Metro-North also stores "bridge plates," equipment to assist customers in boarding and leaving trains, on the Bridgeport Train Station platforms. *Id.* at 135:16–17. Finally, after

decedent's fall from the platform at the Bridgeport Train Station, Metro-North employees constructed a barrier that filled the gap between the guardrail and the platform edge. *Id.* at 57–59.

Amtrak is a passenger railroad carrier established by Congress and incorporated in the District of Columbia. *See* Pub. Law 91-518, 91st Cong. (1970); D.C. Code Ann. § 29-301 *et seq.* Like Metro-North, Amtrak runs trains that stop at the Bridgeport Train Station. Wilhelmy Dep. at 173:13. Amtrak's rights and duties are outlined in a "Trackage Rights Agreement." *See* Defs. Ex. LL. The Trackage Rights Agreement provides that Metro-North and the State of Connecticut would make the rails available to Amtrak and its locomotives. *Id.* §§ 3.1. These entities would maintain and repair the tracks. *Id.* § 4.2.

Amtrak's presence at the Bridgeport Train Station, besides its running of trains there, is limited to the keeping of two electronic ticketing machines and the posting of train schedules at the station. Freer Dep. 29–30, 34. Inspection of the station is generally left to Metro-North and the State of Connecticut, *See* Trackage Rights Agreement § 7.3, although Amtrak performs inspections twice a year to ensure that train platforms are clear of debris and tripping hazards. Freer Dep. at 45–48. Amtrak performs no inspection of guardrails. *Id.* at 52–53.

**B. The Private Entity Defendants**.

Fusco Management Company, LLC is a Connecticut company that manages, operates, and maintains the Bridgeport Train Station pursuant

to a contract with the Connecticut Department of Transportation. *See generally* Property Management Services Agreement Between the State of Connecticut and Fusco Management Company LLC ("Fusco Management Agreement"). The contract tasks Fusco with all required and necessary building operation activities including "preventative maintenance . . . and basic/general repair and maintenance" for a variety of building systems. Fusco Management Agreement at 29. It requires Fusco, in performing this work, to comply with "all applicable Federal and State codes, standards, and guidelines." *Id.* at 4.

ABM Industries Inc. is a Delaware corporation and one of Fusco's subcontractors. *See* Agreement for Services between Fusco Management Company, LLC and ABM/ACSS Security Services ("ABM Agreement."). ABM is responsible for providing "24 hour security" at the Bridgeport Train Station. *Id.* at 2. Its duties include patrolling platforms and pedestrian bridges at the station. *Id.* at 6. Security personnel patrolling the train platforms are required to "observe and report any and all suspicious activity," and to note "conditions of walkways, lighting, cameras, stairs, code blue emergency units[,] platforms[,] and overall safety for the general public . . . ." *See* Sample Post Orders for Stamford Transportation Center at 10 (referring to "Post 5"). Finally, ABM security guards are also responsible for monitoring 25 video screens showing live feeds of all the station platforms and other areas. *See* Torres Dep. at 66.

TAMS Consultants, Inc. is a New York engineering, architecture, and construction management firm. Murphy Dep. at 10:4–5. In 1993, the Connecticut Department of Transportation retained TAMS Consultants to make upgrades to the Bridgeport Train Station to comply with the Americans with Disabilities Act. *See* Personal Services Agreement of June 28, 1993. TAMS Consultant's duties were subsequently expanded to "propos[ing] recommendations or environmental enhancements in and around the station building." Personal Services Agreement of April 27, 1994 at 4. To this end, TAMS Consultants inspected interior and exterior finishes, lighting, landscaping, and the HVAC system. *Id.*

## Discussion

The standard governing motions for summary judgment is well-settled. A court may grant summary judgment only when the moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). "When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

**1. Whether the Court Has Jurisdiction to Try This Case.**

Defendants argue that the court lacks jurisdiction to try this wrongful death and negligence case because the parties are not diverse. Indeed, there is a lack of complete diversity among the parties here because plaintiff and a number of the defendants are citizens of New York State. Thus, absent some federal question, this court lacks jurisdiction to try the case. *See* 28 U.S.C. §§ 1331, 1332. In response to this argument, plaintiff claims to have invoked federal question jurisdiction because he named a federal corporation, Amtrak, as a defendant.

Plaintiff is correct in arguing that a suit against Amtrak invokes federal question jurisdiction. Federal courts have jurisdiction over all civil suits arising under the constitution and laws of the United States. 28 U.S.C. § 1331. A suit against a corporation established by Congress is generally considered to arise under the laws of the United States, *Fed. Intermediate Credit Bank of Columbia, S.C., v. Mitchell*, 277 U.S. 213, 214 (1928), but only where the United States owns more than half of the corporation's stock. *See* 28 U.S.C. § 1349. Since the United States owns more than 50% of Amtrak stock, federal courts have clear jurisdiction in lawsuits where Amtrak is a party. *See, e.g., Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 758 n.1 (7th Cir. 2003).

A more difficult question arises because defendant Amtrak will be dismissed from the case. This wrongful death lawsuit involves the state common-law tort of negligence, and does not invoke any federal cause of action. With Amtrak a defendant in the case, the court could adjudicate

the tort claim as an exercise of its supplemental jurisdiction. *Carlsbad Tech., Inc. v. HIF Bio, Inc.,* 556 U.S. 635, 639 (2009). However, with Amtrak dismissed from the case, an issue arises as to whether the court may continue to exercise jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Making this decision is a matter of discretion. In deciding whether to adjudicate the state law claim, the court must consider notions of fairness, judicial economy, convenience, and comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). For example, the court should consider whether dismissal would occur at an early stage of the proceedings, or whether issues of state law predominate. *Id.*

The court will exercise supplemental jurisdiction over plaintiff's wrongful death/negligence claim even though Amtrak will be dismissed from the case. The case is scheduled to go to trial on May 11, 2015, a little more than three weeks from the date of this opinion and order. The parties have devoted significant resources to preparing for trial, including exchanging large volumes of discovery material and conducting lengthy depositions. It would be decidedly unfair to the parties for the court to dismiss the entire action at this late stage. Moreover, the risk of the court deciding novel issues of state law is slim because the action involves straightforward questions of negligence. Finally, judicial economy would not be served by dismissing the case at this late stage only to have it refiled in state court. Thus, the court will, as a matter of discretion, exercise

supplemental jurisdiction over the case even though defendant Amtrak will be dismissed.

**2. Choice of Law Analysis.**

The parties dispute whether New York or Connecticut law governs in this case. A federal court adjudicating state law claims pendent to a federal claim applies the choice of law rules of the forum state. *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). Here, the forum state is New York. When confronted with conflicting laws of different jurisdictions, a New York court will conduct an "interest analysis" to determine which state has a greater interest in having its law applied in the litigation. *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521 (1994). This is done by evaluating the facts or contacts that relate to the purpose of the law in conflict. *Id.* The court will look to: (1) the significance of the parties' contacts to the jurisdiction, meaning their domicile and the locus of the tort; and (2) whether the purpose of the law is to regulate conduct or allocate loss. *See id.* If the purpose of the law is to regulate conduct, the law of the place of the tort will apply. *Id.* at 522. If the purpose of the law is to allocate loss, the law of the common domicile of the parties will apply.

To begin, the court must determine whether there is a conflict between New York and Connecticut's negligence law and wrongful death statutes. There is generally no conflict between the negligence law of the two states, *except* that they differ in regard to liability for third party contractors. New York generally precludes liability for third-party

contractors except in unusual circumstances, and Connecticut generally allows liability for third party contractors whose activities bear a direct relationship to the plaintiff's harm. *Compare Espinal v. Melville Snow Contractors, Inc.*, 773 N.E.2d 485, 487 (N.Y. 2002), *with Gazo v. City of Stamford,*765 A.2d 505, 509 (Conn. 2001).

Additionally, although the two states' wrongful death statutes are facially similar, there is a key difference between them. Connecticut's wrongful death statute allows recovery for the decedent's loss of enjoyment of life, *see Sanderson v. Steve Enterprises, Inc.*, 491 A.2d 389, 397 n.12 (Conn. 1985), but New York's wrongful death statute does not allow recovery for loss of enjoyment of life. *Sand v. Chapin,* 238 A.D.2d 862, 863 (N.Y. App. Div. 1997). Thus, there is a conflict of laws with regard to the duty owed by third-party contractors and with regard to recovery under wrongful death statutes.

Given this conflict, the interest analysis referred to above requires that the court determine the significance of the parties' contacts with the jurisdiction and the locus of the tort. The more significant contacts in this case are with Connecticut. Decedent, according to plaintiff's testimony, was living in Connecticut at the time of her accident. *See* Bak Dep. at 9:17–19. While plaintiff and some of the defendants are New York residents, all of the defendants have clear ties to Connecticut, either by running trains along the New Haven line or in performing their contracts. Most importantly, the tort itself occurred in Connecticut, as decedent was

injured when she fell from the platform at the Bridgeport Train Station. Thus, the first factor in the interest analysis favors applying Connecticut law.

The second choice of law factor requires the court to determine whether the law asserted regulates conduct, or alternatively whether it allocates loss. Here, plaintiff asserts a wrongful death cause of action premised on negligence. The law of negligence is a conduct-regulating rule because it seeks to hold defendants to a standard of care. *See, e.g., 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Fin. Life Assur. Co.*, No. 12-CV-6808 KMK, 2015 WL 1455805, at *24 (S.D.N.Y. Mar. 31, 2015) (collecting cases). However, wrongful death statutes are loss allocating because they assign liability after a tort has occurred. *Padula*, 84 N.Y.2d at 522. Since the instant motions involve questions regarding negligence, and since negligence is a conduct-regulating rule, this factor also weighs in favor of applying Connecticut law.

Because the forum is New York, the court will apply New York negligence law in determining the duties owed by the public entity defendants, the MTA, Metro-North, and Amtrak. The court will apply Connecticut law with regard to the three private contractor defendants, Fusco, ABM, and TAMS Consultants.

### 3. Whether Defendants Owed Decedent a Duty of Care.

There are four elements to a negligence claim under both Connecticut and New York Law: (1) duty, (2) breach of that duty; (3)

causation; and (4) actual injury. *RK Constructors, Inc. v. Fusco Corp.*, 650 A.2d 153, 155 (Conn. 1994); *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981). Defendants argue that they did not owe a duty of care to decedent, and that that as a result, plaintiff's negligence/wrongful death claim fails as a matter of law.

There is no "algebraic formula" for determining the existence of a duty. *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (1994). Rather, a duty "coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility." *Id.* In determining the existence of a duty, the court will consider "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Id.* at 586.

Landowners generally owe a duty to act as a reasonable person and maintain the premises in a safe condition in view of all the circumstances. *Basso v. Miller*, 40 N.Y.2d 233, 241 (1976). This duty can extend to non-landowners. One who assumes a landowner's duty to act, either by contract or voluntarily, assumes the duty to act carefully. *See Kaplan v. Dart Towing, Inc.*, 159 A.D.2d 610, 612 (N.Y. App. Div. 1990). Assumption of a duty will occur where one exercises a degree of control over the premises approaching the landlord's, thus incurring the landlord's

responsibility to maintain the premises in a safe condition. *Ginsburg v. City of Ithaca*, 5 F. Supp. 3d 243, 248 (N.D.N.Y. 2014) (citing *In re Kush v. City of Buffalo*, 59 N.Y.2d 26, 29 (1983)); *Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 140 (2002).

Under Connecticut law, a contractor may assume a duty to others even though it has not entirely displaced the owner's control of the premises. The duty will arise where there is a direct relationship between the contractor's activities and the foreseeable harm suffered by the plaintiff, and if public policy supports holding the contractor liable. *Gazo v. City of Stamford*, 765 A.2d 505, 508–09 (Conn. 2001). For example, a contractor who shovels snow from sidewalks assumes a duty to prevent foreseeable injuries resulting directly from slips on un-cleared ice, and public policy supports imposing such a duty on them. *Id.* at 509.

### A. Whether the Public Entity Defendants Owed a Duty of Care.

In the instant case, defendant Metro-North argues that it owed no duty to decedent because it neither owned the Bridgeport Train Station nor assumed responsibility to maintain the platform railings. This is not borne out by the facts. Of course, it goes without saying that Metro-North does not own the Bridgeport Train Station. However, plaintiff has provided evidence that Metro-North exhibited a significant degree of *control* over the station and platforms. Its managers inspect stations along the New Haven Line at least every two weeks, looking for issues of "cleanliness and structural damage." Wilhelmy Dep. at 29:9-10. These managers are also

tasked with inspecting platform guardrails. *Id.* at 31. It is their job to "look at them [guardrails] and make sure that the screws are all on the bottom and if anything appears loose . . . report it." *Id.* at 32: 20-22. Finally, and perhaps most tellingly, Metro-North actually performed repairs on the guardrail at issue in this case.[1] *Id.* at 57. After the decedent's fall, the Metro-North "structures department" installed wooden two-by-fours to expand the guardrail. *Id.* at 69. This is dispositive to the question of control. By making repairs to the guardrail, Metro-North demonstrated a significant ownership-like control over the platform. That control is sufficient, as a matter of law, to impute to Metro-North a duty of care to detect and prevent foreseeable injuries that could result from "defective" guardrails. It owed this duty to visitors to the train station, including the decedent. Thus, Metro-North's argument that it did not owe decedent a duty of care is unavailing.

Unlike Metro-North, the other public entity defendants did not exercise control over the Bridgeport train station. The MTA's primary role is to provide financing to entities like Metro-North, not to maintain stations. *See* N.Y. Pub. Auth. Law § 1265. Indeed, New York courts routinely dismiss the MTA as a defendant in tort actions because its functions "do not include the operation, maintenance, and control of any

---

[1] As plaintiff correctly points out, evidence of subsequent repairs is admissible to show ownership or control, and for present purposes, for determining whether Metro North owed decedent a duty of care. *See* Fed. R. Evid. 407.

facility." *See, e.g., Cusick v. Lutheran Med. Ctr.*, 105 A.D.2d 681, 681 (N.Y. App. Div. 1984). Plaintiff argues that the MTA has assumed control over the Bridgeport Train Station, but inexplicably conflates the MTA's duties there with Metro-North's duties. *See* Pls' Mem. L. Opp. Metro Defs' Mot. Summ. J. at 9. In fact, it appears that the MTA's sole tangible connection to the Bridgeport Train Station is that it maintains offices there for MTA police. Wilhelmy Dep. at 18. MTA police walk the station platforms looking for unattended bags and criminal activity. Corcoran Dep. at 19:2–4. While they may also look for other hazards, *id.*, there is no evidence that the MTA has undertaken any responsibility to actually maintain or report on the status of platforms or guardrails. Given that the MTA's functions are limited in nature, it cannot be said that the MTA exerted sufficient control over the Bridgeport Train Station to assume a duty to report, maintain, or repair defective guardrails.

The same is true of defendant Amtrak. Amtrak's sole relationship to the Bridgeport Train Station is that it runs trains that stop there, keeps two electronic ticketing machines there, and posts train schedules. Freer Dep. 29–30, 34. Amtrak does perform twice annual inspections of the platform, but only to look for debris and other hazards. *Id.* at 46. Amtrak does not inspect platform guardrails. *Id.* at 52–53. Plaintiff notes that Amtrak conductors exit the train at each stop, but it would be an exaggeration to characterize this as an "inspection." Indeed, Amtrak conductors only exit the train to ensure that customers have boarded or

- 15 -

deboarded. Freer Dep. at 38–39. They do not inspect the platforms in any meaningful sense, much less platform guardrails. Simply put, the limited nature of Amtrak's connection to the Bridgeport Train Station is insufficient, as a matter of law, to impute to it a duty of care of the type asserted here. Amtrak has not, by contract or control, assumed a duty to report, maintain, or repair defective guardrails.

### B. Whether the Private Entity Defendants Owed a Duty of Care.

Defendant Fusco Management Company, the manager and operator of the Bridgeport Train Station, argues that it owed no duty of care to decedent because it never agreed to repair the station platforms and guardrails. This understates Fusco's activities at the station. Fusco's agreement with the Connecticut Department of Transportation requires it to complete "all required and necessary building operation activities including preventative maintenance . . . .and basic/general repair and maintenance." Fusco Management Agreement at 29. These activities include, but are "not limited to," a host of services including electrical work, plumbing, trade work (masonry etc...) and "oversight of current and future operational needs." *Id.* at 29–30. Moreover, Fusco is authorized to make emergency repairs at the station, and to enter into service contracts for repairs. *Id.* arts. 10, 25. Fusco is also required to appoint an environmental and safety officer for the station. *Id.* at 33. Finally, in 2010 Fusco expressly agreed to include maintenance of the station platforms in the scope of its duties. *See* Bordiere Dep. at 29–31.

There is a direct relationship between Fusco's duties at the Bridgeport Train Station and the type of harm suffered by the decedent. Fusco agreed in its contract to make general repairs at the station. Inherent in making repairs is the task of inspecting structures to ensure their safety. Fusco owed a duty to inspect platform guardrails and to notice defects, and the "defect" in the guardrail at issue in this case is directly related to decedent's injury. Consequently, there is a direct relationship between Fusco's activities and the harm suffered. Moreover, public policy favors holding those tasked with maintaining and repairing structures to a standard of care. Thus, Fusco's argument that it owed no duty to decedent is without merit.

Defendant ABM Management argues that as a security company, it owed no duty to decedent because it had no obligation to report safety hazards on the train platforms. AMB is correct in that its duties did not include maintenance or repair of platform guardrails. However, this overlooks the fact that ABM may have assumed a duty to monitor the train station to discover injured visitors. ABM is required by contract to provide 24-hour security at the station. *See* ABM Agreement at 2. This includes patrolling the station at regular intervals. *Id.* at 6. Moreover, ABM security guards are responsible for monitoring 25 video screens showing live feeds of all the station platforms and other areas. *See* Torres Dep. at 66. Security guards can manipulate the cameras from the control room, and zoom in on areas at the station that merit close scrutiny. *Id.* at 69.

The court is satisfied that, as a matter of law, ABM owed no duty to report, maintain, or repair defective guardrails. However, by providing constant video surveillance of the train station, ABM assumed a duty to discover and react to unusual circumstances such as visitors behaving strangely. Moreover, ABM also assumed a duty to summon help upon discovering injured visitors. Indeed, this is exactly what occurred when an ABM security guard discovered the decedent approximately 22 minutes after her fall. Thus, there is a direct relationship between ABM's activities at the station, providing constant video surveillance and patrols, and the 22 minute length of time decedent remained undiscovered after her fall. Thus, ABM owed a duty of care to the decedent to notice her fall, or to discover her after the fall and summon help. Whether ABM's twenty-two minute delay in doing so actually constituted a breach of that duty is an issue of fact for trial.

Defendant TAMS Consultants owed no duty of care to decedent. TAMS Consultants was hired by the Connecticut Department of Transportation to perform Americans with Disabilities Act compliance upgrades to the station in 1993. *See* Personal Services Agreement of June 28, 1993. TAM Consultants also upgraded the building's HVAC system. Murphy Dep. at 14. However, TAMS Consultants did not construct the original guardrail at issue, which was actually part of the original construction of the station dating to 1971. *See* Morris Letter. Nor did it perform any upgrades to the guardrail. *Id.* at 3. These facts reveal that

there was absolutely no direct relationship between what TAMS Consultants did at the station, provide upgrades for ADA compliance, and decedent's injury, which occurred when she walked through the unguarded gap at the edge of the platform. TAMS Consultants simply did not undertake, by its contract or activities, to recognize or improve all safety related hazards at the Bridgeport Train Station. Rather, TAMS Consultants simply agreed to make the station ADA compliant. Since decedent's injury bears no relationship to ADA compliance, the court is satisfied that TAMS Consultants owed no duty of care to decedent.

Having assessed each defendant's relationship to the Bridgeport Train Station, the court finds that the MTA, Amtrak, and TAMS Consultants owed no duty of care to the decedent. Thus, plaintiff's claim against those entities fails as a matter of law, and their motions for summary judgment will be granted. The remaining defendants, Metro-North, Fusco, and ABM, all owed a duty of care to decedent.

The remaining defendants raise additional arguments in support of their motions for summary judgment, such as: decedent's own actions were the proximate cause of her death, the hazard was open and obvious, or that they lacked notice of the dangerous condition. But each of these arguments raises significant issues of fact, and having reviewed the evidence submitted, the court finds that such issues are in clear dispute. Thus, having concluded that Metro-North, Fusco, and ABM owed a duty

of care to decedent, the court is satisfied that the remaining elements of plaintiff's negligence claim deserve to be presented for trial.

## Conclusion

For the reasons given above, the court grants the motions for summary judgment filed by the Metropolitan Transportation Authority, the National Railroad Passenger Corporation (Amtrak), and TAMS Consultants, Inc. The court denies the motions for summary judgment filed by Metro-North Railroad Company, Fusco Management Company, LLC, and ABM Industries Inc.

This opinion and order resolves the items listed as document numbers 173, 175, 182, and 187 in this case.

SO ORDERED

Dated: New York, New York
April 16, 2015

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/16/15